# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF TEXAS

**FILED**

AUG 1 2 2021

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

**UNITED STATES OF AMERICA**

**V.**                    **CRIMINAL CASE NO: 7:09-CR-00179 (RAJ)**

**JOSHUA BELL**

### MOTION FOR SENTENCE REDUCTION PURSUANT TO 3582(C)(1)(A)

Now comes Joshua Bell, pro-se, respectfully requesting that the Court reduce his sentence to a term less than 311 months.[1] In light of Mr. Bell's young age at the time of the offense, Mr. Bell's lack of criminal history, the amount of time he has already served, *in combination* with Mr. Bell's strides to rehabilitate himself, his commendable prison conduct, his sincere remorse and contrition, the precipitation of a sentence disparity, and the harsh prison conditions presented by COVID-19, extraordinary and compelling reasons exist to grant Mr. Bell's Motion for a Sentence Reduction.

## I.    Background:

On June 24, 2009, Mr. Bell and two other codefendants were indicted on Three Counts: ***Count One***; 18 U.S.C 2113 (d) (Attempted Bank Robbery) & 18 U.S.C. 2 (Aid and Abet); ***Count Two***; (Conspiracy); ***Count Three***; 924(c) (Using a Firearm During a Crime of Violence).  On August 26, 2009, Mr. Bell *immediately* accepted responsibility by pleading guilty to all Three Counts under *no plea agreement* in front of a Magistrate Judge.  In September 2009, District Judge Robert Junell accepted Mr. Bell's guilty plea and on November 24, 2009, Judge Junell sentenced Mr. Bell to 71 months on Count One, 60 months on Count Two to run concurrent with each other, and 240 months on Count Three to run consecutive to Counts One and Two. In total, Mr. Bell was sentenced to 311 months followed by 5 years of supervision.  Mr. Bell filed

---

1  Certified Paralegal, Mr. Noel Delarosa, assisted Mr. Bell in preparing this 3582(C)(1)(A) motion.

several motions attempting to appeal his conviction to no avail. This is Mr. Bell's first time filing for a sentence reduction under 3582(C)(1)(A).

## II.    **Preliminary Statement**:

This case involves three *young* men who were trying to rob an H&K Armored Service vehicle but were unsuccessful. While attempting to rob the "Armored" vehicle, Mr. Bell and codefendant Mr. Savell both pointed their guns at one of the guards (Mathew Parker) and advised him to not reach for his gun (The third defendant was in the getaway car). Mr. Parker ignored their command, reached for his gun then started firing at both of the defendants. Mr. Bell in turn shot Mr. Parker twice in his feet and Mr. Savell shot Mr. Parker in his thigh and chest. The wounds were substantial, but gratefully Mr. Parker survived the shot to his chest, which went in and existed out of his back. Due to this being Mr. Bell's first ever offense, the recommended guideline sentence for Count One and Two was 33-41 months (Cat. I Lev. 20) and the recommended guideline sentence for Count Three was the 10 year mandatory minimum. See: *PSR*. However, due to the seriousness of the offense, Judge Junell granted the government's request for an upward departure on all Three Counts and sentenced Mr. Bell to 71 months on Count One to run concurrent to the 60 months on Count Two, and to 240 months on Count Three to run consecutive to the other Two Counts.

Mr. Bell committed this offense when he just turned *20 years of age* with a promising life ahead of him. Mr. Bell was raised by his mother until the age of 16, then his father fostered him until he graduated high school. *Id*. After graduating high school, Mr. Bell enrolled in the U.S. Navy, and while there he became part of the Sea Bee crew which focused on construction work. At age 18, Mr. Bell received an honorable discharge, and after leaving the Navy Mr. Bell found work as a masonry in a company owned by his grandfather. *Id*. At age 19, Mr. Bell worked in an oilfield, then later found work in an Armored Trucking Company which led to this unfortunate offense taking place. *Id*. The question is, what influenced Mr. Bell – a very young man to involve himself in this serious offense? The answer is Methamphetamine. Sadly, at age 19, Mr. Bell got introduced to Methamphetamine – a poisonous drug that can easily influence a person's actions. From that point forward, Mr. Bell's promising future took a turn for the

worst. *Id.* In an attempt to support the massive Methamphetamine habit he developed, and the fact that he was also homeless with no money to support his way of living, Mr. Bell made the ill-advised decision to rob an H&K Armored Service vehicle. *Id.* Today, at 32 years of age, Mr. Bell continues to relive the horrible decision that almost caused someone their life and caused him 311 months in prison. Below, the Court will find that Mr. Bell is extremely remorseful and contrite for his past conduct. According to BOP's computation data, Mr. Bell has served over 50 percent of his sentence and is scheduled to be released on May 11, 2032. See: *Ex A-1 (Computation Sheet)*. As it stands today, Mr. Bell has served approximately 166 months (13 years and 10 months adding GTC) of the 311 months imposed. Absent the upward departure imposed on the *924(c) Count*, (120 months over the 10 year mandatory minimum) Mr. Bell would have already completed the 10 year mandatory minimum for the *924(c) Count*, and 5 months *more* than the top end of the recommended guideline sentence for Count One and Two (Cat. I Lev. 20 [33-***41 months***] (120 months plus 41 months = 161 months)). Thus, the 166 months Mr. Bell has served completes the recommended guideline sentence. Indeed, 166 months is a significant sentence, especially for someone like Mr. Bell, who has no prior criminal history and has never served a day in prison. As detailed below, Mr. Bell is extremely remorseful and contrite for the crime he has committed, and has taking impressive strides to rehabilitate himself. Further and more importantly, the Court will learn that for the past 16 months Mr. Bell has suffered from the harsh prison conditions presented by the pandemic. Had the pandemic existed during the time Mr. Bell was sentenced, his attorney would have argued for a downward departure due to the harsh prison conditions, and it would be reasonable to believe that Judge Junell may have imposed a sentence less than 311 months. When viewed in its entirety, the extraordinary and compelling circumstances that exist today should persuade the Court to conclude that 311 months is no longer an appropriate sentence, and may in fact be considered a sentence that is "greater than necessary." Thus, reducing Mr. Bell's sentence to time served, or in the alternative reducing his sentence to a term significantly under 311 months would be the appropriate thing to do.

### III.    Administrative Remedies:

The 30 day claims filing requirement will not play a role in this case given that a request for compassionate relief was filed by Mr. Bell and the warden failed to respond. See: Ex A-2.

### IV.    The Court has the Authority, Pursuant to 3582(C)(1)(A) to Reduce Mr. Bell's Sentence to a term less than 311 months Imprisonment.

The First Step Act amended 18 U.S.C. 3582(C)(1)(A) to give district courts the authority to reduce a previously imposed sentence in extraordinary and compelling circumstances. It provides:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or
> upon motion of the defendant after the defendant has fully exhausted all
> administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on
> the defendant's behalf or the lapse of 30 days from the receipt of such a request by
> the warden of the defendant's facility, whichever is earlier, may reduce the term of
> imprisonment (and may impose a term of probation or supervised release with or
> without conditions that does not exceed the unserved portion of the original term of
> imprisonment), after considering the factors set forth in section 3553(a) to the
> extent that they are applicable, if it finds that ---

i)        extraordinary and compelling reasons warrant such a reduction[.]

As the Court is aware, prior to the Covid-19 pandemic, and in the wake of the Covid-19 pandemic, numerous district courts around the country including district courts within the Fifth Circuit have granted sentence reduction motions under 3582(C)(1)(A).

### V.    1B1.13 of the Sentencing Guidelines as well as Application Note 1D does not apply to 3582(C)(1)(A) motions brought by defendants.

Several Courts of Appeals and the majority of district courts agree that 1B1.13 and Application Note 1D do not apply to 3582(C)(1)(A) motions brought by defendants. For instance, the Second Circuit Court of Appeals in *Brooker* determined that the provisions were inapplicable to such motions and applied only to motions brought by the BOP:

> In other words, if a compassionate release motion is not brought by the BOP
> Director, Guideline 1B1.13 does not, by its own terms, apply to it. Because
> Guideline 1B1.13 is not "applicable" to compassionate release motions by
> defendants, Application Note 1(D) cannot constrain district courts' discretion to
> consider whether any reasons are extraordinary and compelling. 976 F.3d at 236.

For motions brought by inmates, the court ruled that "a district court's discretion in this area – as in all sentencing matters – is broad". *Id.* at 237. Further, the Second Circuit explained that what could be considered and relied on by a court considering a 3582(C)(1)(A) was ***virtually unlimited***: "[t]he only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation. . .alone shall not be considered an extraordinary and compelling reason.'" *Id.* at 237-238. (quoting 3582(C)(1)(A). A district court's broad discretion extends to reducing sentences that were unjust or unfair based on their length or a defendant's youth at the time of the offense, or both. *Id.* at 238. In doing so, the Second Circuit cited with approval *United States v. Maumau*, 2020 WL 806121 (D. Utah), a case in which the district court granted a reduction because the original sentence was overly long. *Id.*

The Fourth, Fifth, Sixth, Seventh, Ninth, and Tenth Circuits soon followed confirming that district courts' have broad discretion when ruling on 3582(C)(1)(A) motions brought by defendants and they held that 1B1.13 of the Sentencing Guidelines is not an "applicable policy statement[]" within the meaning of 3582(C)(1)(A). <u>See</u>: *United States v. Jones*, F.3d, 2020 WL 6817488, at *9 (6th Cir. Nov. 20, 2020) ("in cases where incarcerated persons file motions for compassionate release, federal judges may skip step two of the 3582(C)(1)(A) inquiry and have full discretion to define "extraordinary and compelling" without consulting the policy statement 1B1.13."); *United States v. Gunn*, F.3d, 2020 WL 6813995 at *2 (7th Cir. Nov. 20, 2020) ("Section 1B1.13 addresses motions and determinations of the Director, not motions by prisoners. In other words, the Sentencing Commission has not yet issued a policy statement "applicable" to Gunn's request. And because the Guidelines Manual lacks an applicable policy statement, the trailing paragraph of 3582(C)(1)(A) does not curtail a district judge's discretion."); *United States v. McCoy*, F.3d, 2020 WL 7050097 at *7 (4th Cir. Dec. 2, 2020) ("We agree with the decisions of these courts of appeals, which reflect a growing consensus in the district courts. . . .[In]short,

1B1.13 does not apply to defendant filed motions under 3582(C)(1)(A)."); *United states v. Maumau*, No. 20-4056, 2021 U.S. App. LEXIS 9510 (10th Cir. Apr. 1, 2021) ("First, it ignores the fact that the Sentencing Commission has failed to fulfill its statutory duty to issue a post-First Step Act policy statement recognizing the ability of defendants to file their own motions for sentence reduction. Second, and relatedly, it effectively undercuts the statutory changes that Congress made in the First Step Act where it authorized defendants to file motions."); *United States v. Shkambi*, No. 20-40543, (5th Cir. Apr. 7, 2021) (The question presented was whether the U.S. Sentencing Commission's compassionate release policy statement binds district courts in considering prisoners' motions under the First Step Act. The district court said yes and dismissed *Franceska Shkambi's* motion for lack of jurisdiction. That was wrong for two reasons. First, the district court did have jurisdiction. And second, the policy statement is inapplicable. The court reversed and remanded for further proceedings consistent with this opinion); and *United States v. Aruda*, No. 20-10245, (9th Cir. Apr. 8, 2021) (The panel held that the current version of 1B1.13 is not an "applicable policy statement[] issued by the Sentencing Commission" for motions filed by a defendant under 18 U.S.C. 3582(C)(1)(A)).

The decisions also confirm that a district court's discretion is broad. *Jones*, 2020 WL 6817488 at *9 (noting that the district court's decision is reviewed under a deferential abuse of discretion standard); *Gunn*, 2020 WL 6813995 at *2 (explaining that district courts have discretion to resolve inmate filed compassionate release motions within the statutory scheme). For example, in *McCoy*, the Fourth Circuit affirmed several sentence reductions and held that the defendants' lengthy, stacked 924(c) sentences were a factor a district court could consider when resolving a 3582(C)(1)(A) motion: "In sum, we find that the district courts permissibly treated as 'extraordinary and compelling reasons' for compassionate release the severity of the defendants' 924(c) sentences and the extent of the disparity between the defendants' sentences and those provided for under the First Step Act." 2020 WL 7050097 at *11.

## VI.   18 U.S.C. 3582(C)(1)(A) is a Sentence Reduction Vehicle.

Importantly, there exists a common misnomer, that 3582(C)(1)(A) is an all or nothing provision that requires a court to release the defendant or deny the motion. Indeed, nothing in the statutory language indicates that 3582(C)(1)(A) is an all or nothing provision. In fact, at least two Courts of Appeals have expressed that 3582(C)(1)(A) is not an all or nothing provision, but rather a *"Sentence Reduction Vehicle"*. For instance, in *Brooker*, the Second Circuit observed the following:

> It bears remembering that compassionate release is a misnomer. 18 U.S.C. 3582(C)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence, or end the term of imprisonment but impose a significant term of probation or supervised release in its place.

The Seventh Circuit's decision also confirms the Second Circuit's conclusion that 3582(C)(1)(A) is a sentence reduction vehicle and not an immediate release or nothing provision. *Jones,* 2020 WL 6817488 at *3 n.7. See also: *United States v. Curry*, No. ELH-17-0387, 2021 U.S. Dist. LEXIS 7016 (D. Md. Jan. 14, 2021):

> "The First Step Act does not constrain the Court to decide between immediate release or no reduction at all, and instead leaves the Court discretion in its evaluation of the appropriate sentence once it finds 'extraordinary and compelling reasons'" United States v. Braxton, Crim No. JKB-09478, 2020 U.S. Dist. LEXIS 147379, 2020 WL 4748536 (D. Md. Aug. 17, 2020). Thus, the Court's decision need not be confined either to immediate release or leaving the existing sentence intact. The statutory text of the First Step Act allows courts to "reduce the term of imprisonment," upon a finding of "extraordinary and compelling reasons." 18 U.S.C. 3582(C)(1)(A).

The *Curry* Court went on to say:

> Numerous district courts in both this Circuit and others have found that a court need "not choose between immediate, unconditional release or no relief at all" and have,

accordingly, granted sentence reductions that did not result in immediate release. *See*, e.g., *United States v. Johnson*, No. RDB-07-0153, ECF. No. 183, 2020 U.S. Dist. LEXIS 190921 (D. Md. Oct. 14, 2020) (reducing sentence from 246 months to 168 months); *United States v. Marks*, 455 F. Supp. 3d. 17-2020 WL 1908911, at *17 (W.D.N.Y. 2020) (reducing sentence from 40 years to 20 years); *United States v. Arey*, 461 F. Supp. 3d. 343, 2020 WL 2464796 (W.D. Va. 2020) (reducing sentence but denying immediate release); *United States v. Day*, 474. F. Supp. 3d. 790 2020 U.S. Dist. LEXIS 133586 (E.D. Va. 2020) (same). *Id*. Thus, the Court can "reduce but not eliminate" Mr. Bell's "sentence, or end the term of imprisonment."

Notably, not one of the Seven Circuit Courts of Appeals who have agreed that 1B1.13 is not applicable to motions brought by defendants have ruled that 18 U.S.C. 3582(C)(1)(A) is an all or nothing provision that requires a court to release the defendant or deny the motion. As a matter of fact, a large number of district courts within those Seven Circuits have elected to reduce sentences in the alternative of granting time served. <u>See</u>: *United States v. Quinones*, 2021 WL 797835 (S.D.N.Y. Feb. 27, 2021) (Reduced from life to 35 years'); *United States v. Rios*, 2020 U.S. Dist. LEXIS 230074, 2020 WL 7246440 (D. Conn. Dec. 8, 2020) (Reduced from three-life sentences to 360 months); *United States v. Legette-Bey*, No. 1:02-cr-367, 1:03-cr-136, 2021 U.S. Dist. LEXIS 10165 (N.D. Ohio. Jan. 20, 2021) (Reduced from 1,846 months to 360 months and one day); *United States v. McDonel*, 2021 U.S. Dist. LEXIS 6401 (E.D. Mich. Jan. 13, 2021) (Reduced from 107 years' to 240 months); *United States v. Williams*, 2020 Dist. LEXIS 179932 (W.D. Va. Sept. 29, 2020) (Reduced from life to 188 months); *United States v. Austin*, 2020 U.S. Dist. LEXIS 221125 (N.D. Illinois. Nov. 25, 2020) (Reduced from 684 months to 288 months); ***Unites States v. Rainwater*, 2021 LEXIS 79199 (N.D. Texas. Apr. 26, 2021) (Reduced from 1,117 months to 397 months); *United States v. Lyle*, 2020 U.S. Dist. LEXIS 231578 (S.D. Texas. Dec. 9, 2020) (Reduced from 1,141 months to 493 months);** *United States v. Urkevich*, 2019 WL 6037391 (D. Neb. Nov. 14, 2019) (Reduced from 848 months to 368 months).

Thus, the Court can "reduce but not eliminate" Mr. Bell's "sentence, or end the term of imprisonment." *Brooker, Supra*.

## VII.   The Court should find "Extraordinary and Compelling Reasons" and Reduce Mr. Bell's Sentence.

### A. Mr. Bell's Young Age at the time of the Offense, Along with Mr. Bell's lack of Criminal History and the Amount of Time he has Served, Rises to the Level of Extraordinary and Compelling when "Combined" with the "other Factors" detailed below.

As mentioned above, Mr. Bell barely turned 20 years of age when the bases for this offense took place. Furthermore, Mr. Bell *does not* have a prior criminal history. Indeed, courts around the country have found that a defendant's age at the time of the offense *along* with their lack of criminal history and the amount of time they have served, can be considered an extraordinary and compelling factor warranting a sentence reduction. See: **United States v. Rainwater, 2021 U.S. Dist. LEXIS 79199 (N.D. Texas. Apr. 26,2021) (Finding that "each defendant's individual circumstances – including their youth at the time of their offenses, their lack of significant prior criminal history, their exemplary behavior and rehabilitation in prison, and their already substantial years of incarceration," can be considered as an extraordinary and compelling factor. *Citing McCoy*, 981 F. 3d at 274);** See also: *United States v. Kornacki*, 2021 U.S. Dist. LEXIS 38530 (Mar. 2, 2021) ("Additional individual factors include a defendant's lack of a criminal history, youth at the time of the commission of the crime . . . rehabilitation efforts, and prison behavior."); *United States v. McDonel*, 2021 U.S. Dist. LEXIS 6401, 2021 WL 120935 at *4-5. (Holding defendant was young when he committed a crime at the age of 19); *United States v. Maumau*, 2020 U.S. Dist. LEXIS 28392 [WL] at *7. ("a combination of factors – Mr. Maumau's young age at the time of sentencing . . ." along with other factors found to be extraordinary and compelling); *United States v. Nafkha*, 2021 WL 83268 at *4 (D. Utah. Jan. 11, 2021) ("Mr. Nafkha's young age at the time of sentencing. . ." along with other factors found to be extraordinary and compelling); and, *United States v. Harris*, 2020 U.S. Dist. LEXIS 245018 (E.D. Pa. Dec. 31, 2020) (Finding that because defendant "committed the offense at a young age (this) weighed in favor of finding extraordinary and compelling reasons." See also: *McCoy* (4th Cir.) (District Courts are encouraged to give "full

consideration of defendants' individual circumstances," including their young age at the time of the offense, the substantial sentences they already served, and evidence of rehabilitation.).

Notably, in *Harris, Supra,* where the defendant was involved in two robberies and held the people at gun point, the court observed that "Mr. Harris's crimes although undoubtedly serious, occurred in his early twenties largely motivated by his drug addiction." Mr. Harris was re-sentenced to time served. Mr. Bell falls squarely in the category of the many defendants like *Harris*, who have committed violent offenses which were influenced by their drug addiction problems. Furthermore, and as indicated above, Mr. Bell has already served the recommended guideline sentence on all three counts. In fact, Mr. Bell has served 5 months more than what the sentencing guidelines recommend for someone to serve who has no prior criminal history.

In light of Mr. Bells young age at the time of the offense, his lack of criminal history, and the amount of time he has already served, the Court should find *in connection* with the other factors detailed below, that the initial 311 months sentence imposed on Mr. Bell is no longer necessary, and under today's circumstances may in fact be "greater than necessary." Thus, Mr. Bell respectfully requests that the Court reduce his sentence to time served, or in the alternative, reduce his sentence to a term the Court deems appropriate.

### B. Mr. Bell's Rehabilitative Efforts, Along with his Prison Conduct and his Remorse and Contrition Rises to the Level of Extraordinary and Compelling when "Combined" with the "other Factors" detailed in this Motion.

Mr. Bell's early stages in prison started off in the wrong direction. Because of his affiliation to a gang called "*The Aryan Brotherhood*," Mr. Bell involved himself in 5 fights and was found in possession of a weapon 3 times. See: *Ex A-3 (Disciplinary Report)*. Mr. Bell was considered a *soldier* in the gang, therefore, whenever his superiors ordered him to do their dirty work, Mr. Bell was required to follow through on their orders or not he would be subject to serious penalties. Additionally, Mr. Bell was utilized as one of the individuals who were responsible for holding the knives of his gang members. His involvement in "The Aryan Brotherhood" gang caused more grief than promises. Fortunately for Mr. Bell, in 2016, he had enough of the strong hold the gang had on him. He realized it wasn't for him, and he knew that if he did not

withdraw from their activities he would one day find himself serving a lengthier sentence or end up dead. Mr. Bell explains his experience in prison as follows:

> I started this sentence on an entirely different path. My first day in prison I was led to believe the only way to do time in prison was to join a gang. The only choice was which one. So not knowing better I did. And after years of following orders blindly I realized that if I continue down this road of destruction I was either going to do the rest of my life in prison or would be killed because of it. After weighing my options, I chose the most difficult choice and dropped out. See: *Ex A-4* (*Mr. Bell's Letter*).

The reason why dropping out of the gang was "the most difficult choice" for Mr. Bell to make, was because abandoning "The Aryan Brotherhood" gang also came with a price. Indeed, because he abandon the gang, Mr. Bell became an enemy of "The Aryan Brotherhood." Today, Mr. Bell is considered a target at any prison where "The Aryan Brotherhood" are housed in. In fact, in 2016 after dropping out of the gang, the BOP mistakenly placed Mr. Bell in an active facility where members of "The Aryan Brotherhood" are housed. Consequently, Mr. Bell was attacked and had no choice but to defend himself. In late 2017, the same thing happened in another institution. See: *Ex A-4, [Mr. Bell's Letter]*: ("I knew the violence that would now be sent after me because I chose to change my life but I want to help people not hurt them. Because of my now ex-gang affiliation I was assaulted and transferred. The next prison I got into a fight with two inmates because I no longer was in their gang. This happened at 4 different prisons before I was finally housed at a gang free yard."). As just indicated, in early 2018, the BOP took the appropriate steps to make sure that Mr. Bell was not placed in an active-gang facility. Since being transferred to a non-active-gang facility, Mr. Bell has not engaged in any fighting. See: *Ex A-3* (*Disciplinary Report – Last write up was for a minor violation which occurred over 2 years ago*). Aside from a minor write up that he received in 2019, Mr. Bell has demonstrated that he is not "a management concern." See: *Ex A-5* (*Progress Report*).

Mr. Bell in a consistent pattern has taken significant strides to rehabilitate himself. This includes participating in numerous BOP programs. Some of the programs Mr. Bell participated

in involve: *Parenting, Numbers & Operations, U.S. History Part 1 &2, Basic Astrology, Personal*

*Finance, Communications Strategies, Money 2, Commercial Driver's License, Finance Plan,*

*Personal Banking*, and *Acrylic Painting Class*. See: *Ex A-6 (Educ. Trans)*.[2] Mr. Bell also

participated, and completed a *2,437* hour course where he earned a *Welder Apprenticeship*,

and he is currently participating in the vocational programs offered by the National Center for

Construction Education and Research such as the *Introductory Craft Skills, Construction Site*

*Safety Orientation, Core Curriculum* program. *Id*. Due to his impressive turn around, the BOP

has rewarded Mr. Bell by lowering his custody points and transferring him to an FCI facility.

Due to his continued pattern of good behavior, it is anticipated that Mr. Bell will be eligible to

be transferred to a low institution after being reviewed by his Unit Team. See: *Ex A-7*

(*Classification Sheet – 15 points and under is required to be eligible for a transfer to a low*

*facility – Mr. Bell currently has 16 points*).  It is clear, that as Mr. Bell began to age, he made the

wise decision to abandon all gang activities. Mr. Bell's impressive rehabilitative efforts is

indicative of his willingness to correct his past behavior and live a trouble free life.  Thus, Mr.

Bell's willingness to abandon all gang activities and focus on fully and unconditionally

rehabilitating himself is nothing less than impressive – indeed, it's remarkable.  The BOP

describes Mr. Bell's remarkable turn-around as follows:

> Inmate Bell arrived at FCI Fairton on October 9, 2018.  During his subsequent reviews, it
> was recommend he participate in educational programs, maintain clear conduct, and
> maintain a high level of sanitation standards . . . inmate Bell received outstanding work
> performance evaluations when assigned to the Orderly, and Food Service work details.
> He was responsible for keeping the unit clean and maintaining a high level of sanitation
> standards . . . Inmate Bell participated in numerous programs during his incarceration.
> He is currently participating in the NCCER Core Curriculum vocational program.  The
> program consist of basic construction skills related to plumbing, electrician, masonry,
> and carpentry.  The program is a six (6) month course with Journey-level certifications
> after completion . . . Inmate Bell interacts appropriately with staff and is not considered

---

2  Due to social distancing practices, the BOP has put on pause many educational programs, which has
prevented Mr. Bell from furthering his education.

to be a management concern at this time . . . He no longer aligns or affiliate with gang members and appears to be making satisfactory progress toward his goal of rehabilitation. See: *Ex A-5 (Progress Report)*.

Aside from the BOP, family and friends of Mr. Bell submit letters describing Mr. Bell's remarkable turn-around in support of a sentence reduction:

- Robbie Zundt, the mother of Mr. Bell, notes that in Mr. Bell's early days in prison, "he could not stay out of trouble. Every time I talked to him, I thought to myself that he was never going to get out of prison because he was not learning his lesson . . . he had joined the Aryan Brotherhood. He was not raised to be a racist. I just did not understand what was going on with him." Then, "Josh quit the gang life. Realizing that violence and fighting was not what he wanted to be a part of. He started talking about how he was getting back in touch with his religious beliefs . . . When I would talk to him over the phone he seemed happier if that is possible (while in prison). We finally talked about the elephant in the room, his incarceration. We talked about his remorse and the drugs. The regret he felt for shaming our family. The pain and suffering inflicted on the armor car guard . . . I know he has not been the model inmate. But as he has grown in age, he has also grown into maturity. <u>See</u>: *Ex A-8.*

- Ms. Joan Jones, a friend of Mr. Bell, notes Mr. Bell "has learned his lesson for what he did . . . he has a place to come to and a job waiting for him when he gets out." <u>See</u>: *Ex A-9.*

- Ms. Vicky Jo. Bock, a friend of Mr. Bell, met him "through my son back in 2016. I found out through my son that Joshua had a not so good childhood, so I started talking to him . . . and sent him money for food, clothes . . . he is now my son (not legally) but mine in heart and spirit. Joshua is a good man, who knows he made a very big mistake and I know he will never go to prison again . . . please give Joshua the opportunity to live a loving, caring and productive life." <u>See</u>: *Ex A-10.*

- Inmate Jammie Moore, a friend of Mr. Bell, notes that he has "known Mr. Bell since 2018" and he has "witnessed the positive support and compassionate impact he has had

with others, including myself." Mr. Moore, goes on to note that Mr. Bell "is always honest and very respectful to staff . . . Mr. Bell has a very strong support system to provide him with guidance, care, encouragement and employment." See: Ex A-11.

The Court should also consider Mr. Bell's sincere Remorse and Contrition. Surely, immediately after being arrested, Mr. Bell pleaded guilty to the mercy of the Court with the hopes of obtaining a guideline sentence or a sentence near it. Unfortunately for Mr. Bell, Judge Junell did not find his quick acceptance of responsibility persuasive. As indicated above, Mr. Bell reminds himself daily of the poor decision he made that could have costed someone their life. The following is Mr. Bell's personal regrets and remorse for his actions:

> I write this letter today not as the 20 year old kid who ruined his life with a dumb stupid mistake, but as the 32 year old man who has learned to not take this prison sentence as a punishment but as an opportunity to change and mature into someone I can look into the mirror and like. I have done my best to change and to mature into a man . . . I have tried to get in contact with Mr. Parker (the armored guard who was shot) to apologize for my actions. I know I will never be able to erase the physical and mental scars that I inflicted but I truly wish I could make amends. Nobody deserves that. He was working to provide for his family and I was trying to get money to buy drugs and I changed his life forever. I am so sorry. I never realized my actions effected so many people, Mr. Parker and his family, (and) the witnesses who will never forget what they saw—my family! . . . I've learned my lesson but more than that, prison has shaped me into the man I am today, and for that, I am grateful. See: Ex A-4.

Thus, Mr. Bell's rehabilitative efforts, along with his prison record and sincere remorse and contrition when *viewed in connection* with the other factors detailed in this motion demonstrate "extraordinary and compelling reasons" warranting a sentence reduction – even to time served. *Braxton*, 2021 U.S. Dist. LEXIS 82802 (E.D. Texas. Apr. 30, 2021) (Finding that "while rehabilitation alone is not an 'extraordinary and compelling' reason for a sentence reduction, it can be a significant factor warranting a sentence reduction when an inmate has an otherwise qualifying condition.").

## C. Harsh Prison Conditions Due to the Pandemic.

The harsh prison conditions due to the pandemic, combined with the other factors described herein demonstrate "extraordinary and compelling reasons" warranting a sentence reduction. Further, had the pandemic been in existence during the time Mr. Bell was initially sentenced, there is a strong possibility that Judge Junell may not have imposed a 311 month sentence. Indeed, district courts have found this analogy to be correct. See: *United States v. Garcia*, No. 11-CR-989 (JSR) 2020 U.S. Dist. LEXIS 230236 (Dec. 8, 2020. S.D.N.Y.) ("It is obvious that the . . . court would have imposed a lower sentence if the pandemic conditions were in play at the time of the original sentence."). The Garcia court also noted, "How much of a reduction it warrants is a very different inquiry, not subject to any Guidelines or other proscribed calculation." *Id.* See also: *United States v. Quinones*, 2021 U.S. Dist. LEXIS 37628, *5 (Feb. 27, 2021. S.D.N.Y.) ("the Court finds, as it did with Rodriguez, that the pandemic, because of the concomitant lockdowns and restrictions that are necessary to ensure inmate safety, has rendered Quinones's incarceration "far harsher and more [*6] punitive than the Court had anticipated at sentencing." Rodriguez, 2020 U.S. Dist. LEXIS 181004, 2020 WL 5810161. At *8. This too, is relevant to the Court's finding of extraordinary and compelling reasons."); *United States v. Cheese*, 2021 U.S. Dist. LEXIS 25218 (D. Md. Feb. 9, 2021) ("incarceration in the midst of a global pandemic has 'sufficiently increased the severity of the sentence beyond what was originally anticipated such that the purposes of sentencing are fully met even with the proposed reduction.'" (Citing: *United States v. Greene*, 2020 U.S. Dist. LEXIS 99129 (D. Md. June 4, 2020); and *United States v. Bass*, 2021 U.S. Dist. LEXIS 28791 (E.D. Mich. Feb. 8, 2021) ("Today, compassionate release is widely understood as a means of protecting defendants from suffering harm due to unforeseen changed circumstances during their sentences.").

The Court in *Ciprian* said it best:

> As has been widely chronicled, the pandemic has required extreme restrictions on prisoners' movements and visits. It also exposed prisoners to heightened fears of contagion. Long before the current pandemic, courts had recognized that periods of pre-sentence custody spent in unusually arduous conditions merited recognition by

courts measuring the just sentence. The same logic applies here. A day spent in prison under extreme lockdown and fear of contracting a deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While not intended as punishment, incarceration in such conditions, is unavoidably, more punishing. *United States v. Ciprian*, No. 11-CR-1032-74 (PAE) 2021 U.S. Dist. LEXIS 18698 (S.D.N.Y. Feb. 1, 2021).

In a recent case, *United States v. Hatcher*, No. 18-CR-454-10 (KPF) WL 1535310 (S.D.N.Y. 2021) (The court noted that it has previously "found that harsh prison conditions of imprisonment occasioned by the COVID-19 pandemic are not, without more, sufficiently "extraordinary and compelling" to warrant compassionate release." However, the court went on to note that its rulings on that were "issued in the fourth, rather than the thirteenth month of the COVID-19 pandemic. Moreover, it is also true that courts reviewing motions for sentence modifications have considered the extent to which onerous lockdowns and restrictions imposed by correctional facilities attempting to control the spread of the virus have made sentences harsher and more punitive than would otherwise have been the case.").

Importantly, the Fourth Circuit Court of Appeals also expressed its concern regarding harsh prison conditions when it noted that: ("Section 3582(C)(1)(A) necessarily envisions that the 3553(A) factors may balance differently upon a motion for compassionate release than they did at the initial sentence."). Chief Judge Roger Gregory went on to note, ("There is good reason to believe that, in some cases, a sentence that was 'sufficient but not greater than necessary' before the coronavirus pandemic may no longer meet the criteria. A day in prison under the current conditions is a qualitatively different type of punishment than one day in prison used to be. In these times, drastically different. These conditions, not contemplated by the original sentencing court, undoubtedly increase a prison sentence's punitive effect."). *United States v. Kibble*, No. 20-7009, 2021 U.S. App. LEXIS 9530 (4th Cir. Apr. 1, 2021).

For the past 16 months, Mr. Bell has suffered from the harsh prison conditions occasioned by the pandemic. Although every inmate incarcerated during the pandemic has generally suffered as well, not every inmate was effected like Mr. Bell. For instance, Mr. Bell depended

on visiting with his family and friends at least once a month. The visits amongst other things, involved conversations that dealt with self-motivation, how to rehabilitate, and reflecting over past mistakes. Hence, visiting with his family and friends became therapeutic for Mr. Bell – at the same time, his family/friends benefitted from their conversations. Nevertheless, the pandemic interrupted what Mr. Bell and his family/friends found to be helpful on both ends. Since the start of the pandemic, Mr. Bell has yet to visit with his family/friends. The Court should find this concerning, especially for someone like Mr. Bell who is already serving a 311 month sentence – *a severe punishment* – and has done everything in his power to establish and maintain strong family ties. Further, and as indicated above, Mr. Bell's ability to continue his educational voyage has diminished due to the pandemic.

As the Court is aware, not every inmate likes to program. Mr. Bell on the other hand has proven to be an inmate who desires to learn and improve himself in every aspect of his life. There is no doubt that Judge Junell, did not anticipate when sentencing Mr. Bell that he would have to suffer more than expected. Nevertheless, these circumstances exist today. Indeed, Mr. Bell continues to suffer from an *unforeseen* tragedy, which has amounted to harsher penalties not foreseen by Judge Junell. The harsh prison conditions *along* with Mr. Bell's exceptional rehabilitation and commendable prison conduct rises to the level of "extraordinary and compelling" warranting a sentence reduction. At least one of the Courts of Appeals (Second Circuit) has indicated that while rehabilitation "alone" is insufficient, it can "interact with the present coronavirus pandemic" to create an extraordinary and compelling reason for a sentence reduction. See: *Brooker*, 2020 U.S. App. LEXIS 30605, 2020 WL 5739712, at *9. Thus, the Court can and should view the harsh prison conditions *in connection* with the other factors detailed herein and find that "extraordinary and compelling reasons" exist warranting a sentence reduction.

### D. Unwarranted Sentencing Disparity among Defendants, Along with the Other Factors detailed in this Motion Demonstrate Extraordinary and Compelling Reasons Warranting a Sentence Reduction.

Allowing Mr. Bell's sentence to remain unchanged precipitates a circumstance of unwarranted sentencing disparity. As the Fifth Circuit has observed in *United States v. Balleza*,

613 Fed. Appx. 432, 2020 U.S. App. LEXIS 16232 (5th Cir. July 27, 2010) (18 U.S.C. 3553(a)(6) requires "that unwarranted sentence disparities not be created between defendants who have been found guilty of similar conduct.").  While Mr. Bell does not minimize his past conduct, it bears emphasizing that since the passing of the First Step Act, courts around the country continue to grant compassionate release motions brought by defendants whose crimes are similar or far more serious than Mr. Bell.  Although, Congress specifically focused on a national disparity involving defendants with similar records who have been found guilty of similar conduct, this does not preclude the Court from comparing Mr. Bell's sentence to those sentences of defendants who have committed far worse crimes than Mr. Bell, but have received sentence reductions – even to time served under 3582(C)(1)(A).  District courts are only prohibited from comparing cases involving defendants who have committed *less* serious offenses.  See: *United States v. Spells*, 811 Fed. Appx. 544; 2020 U.S. App. LEXIS 13191 (11th Cir. Apr. 24, 2020) ("District courts should not draw comparisons to cases involving defendants who were convicted of less serious offense when assessing potential sentencing disparities.").  The following cases demonstrate an unwarranted sentence disparity:

## 1.  Similar Offenses:

The decision in *United States v. Reid*, 2021 U.S. Dist. LEXIS 42380 (E.D. N.Y. Mar. 5, 2021) is a good example.  *Reid* went to trial and was convicted by a jury on One Count of Hobbs Act Conspiracy, multiple Counts of Hobbs Act Robbery, One Count of discharging a firearm during a crime of violence and multiple Counts of brandishing a firearm during a crime of violence, and was sentenced to 1,434 months imprisonment.  *Reid* was the "organizer" of "a series of robberies.  Several victims were injured as a result of Mr. Reid's . . . crimes." *Id*.  The crimes involved beating and kicking shop keepers, striking them in the head, and "firing bullets in" a shop keepers direction to kill" him.  *Reid* was offered 16 to 17 years but he declined and proceeded to trial.  "As with his state trial, Mr. Reid repeatedly sought to obstruct justice, suborn perjury and threaten witnesses against him, both before and after their testimony," including threatening to have one witness "attacked at the [Metropolitan Detention Center] and killed if deported to Jamaica."  Throughout his incarceration, *Reid* "incurred *seven* disciplinary infractions" and his last one being in 2018 for "destroying an item by swallowing it

during an officer's attempt to search him." *Id.* (emphasis added). Ultimately, the court reduced *Reid's* sentence to 252 months (21 years).

A similar case is found in *United States v. Mack*, 2021 U.S. Dist. LEXIS 3947 (S.D. Ohio. Mar. 23, 2021) (*Mack* went to trial and after being convicted of *Three* Counts of Armed Bank Robbery, *Three* firearm Counts and *Six* Counts of Unarmed Bank Robbery, he was sentenced to 660 months and 5 years of supervision. *Mack* had a *prior* record that involved a petit theft conviction, disorderly conduct and attempted robbery. He was 26 years of age when he committed the instant offense. Although, "the use of firearms during the first *three* robberies was also serious," the Court reduced *Mack's* sentence to time served but extended his supervision from 5 years to 10 years.). <u>More Cases Follow</u>: *United States v. Coleman*, 2021 U.S. Dist. LEXIS 1512 (E.D. Pa. Jan. 6, 2021) (where the defendant (*Coleman*) who went to trial, was sentenced to 360 months after being convicted of Conspiracy to Commit Bank Robbery, Attempted Bank Robbery or Aiding Abetting Attempted Bank Robbery and 924(c) firearm – in furtherance of a crime of violence. Coleman had *two* prior convictions and was deemed a career offender. The court ultimately reduced his sentence to time served.); *United States v. Rollins*, 2021 U.S. Dist. LEXIS 49514 (N.D. Illinois Mar. 17, 2021) (*Rollins* went to trial and was convicted of Four Counts of Bank Robbery and Four Counts of 924(c). *Rollins* was 26 years of age and had a prior criminal history that included *two* prior convictions for possession of a firearm at age 18 and obstructing an officer at age 20, and he was convicted in state court for discharging "a pistol at a vehicle he knew to be occupied." *Id. Rollins* was sentenced to 1,278 months. The court ultimately reduced Rollin's sentence to time served.); *United States v. Nafkha*, 2021 U.S. Dist. LEXIS 5814 (D. Utah Jan. 11, 2021) (Where the defendant, Nafkha who went to trial was sentenced to 73 years after being convicted of *Five* Counts of Armed Bank Robberies, *Two* Counts of possessing a firearm – 922(g), and *Four* Counts of 924(c). *Nafkha* was 23 years of age when he committed his offense, but he "spent his teenage years in and out of juvenile detention, group homes, and even secure facilities." Nafkha also incurred "34" disciplinary infractions throughout his period of incarceration, "but Mr. Nafkha has not been cited for any offenses or prohibited acts in the last four years." *Id.* The court reduced Nafkha's sentence from 73 years to time served, largely due to his young age.); and *United States v.*

*Rainwater*, 2021 U.S. Dist. LEXIS 79199 (N.D. Texas. Apr. 26, 2021) (Where the defendant, Rainwater who went to trial was sentenced to 1,117 months after being convicted of *Six* Counts of Robbery and *Five* Counts of 924(c)(1), but the court reduced his sentence to 397 months despite the fact that "Rainwater committed a series of violent crimes" that "involved the use of weapons (guns, knives) and other acts of violence, such as death threats and forcing store employees into the store's walk-in-coolers." *Id*. Additionally, "Rainwater . . . perjured himself at trial," resulting in the court enhancing "the guideline portion of his sentence for obstructing justice through his false testimony." *Id*. In reducing Rainwater's sentence, the court considered Rainwater's young age at the time of his offense, his rehabilitation, and his lack of prior criminal history. *Id*.

## 2. **Far More Serious Offenses**:

The decision in *United States v. Quinones*, 2021 WL 797835 (S.D.N.Y. Feb. 27, 2021) is one prime example. (*Quinones*, involved Alan Quinones, who was the head of an organization "in the Bronx and elsewhere" that was "focused in the distribution of cocaine and heroin." *Id*. at *1. Once he was arrested, Quinones and an associate retaliated against a *confidential informant* by having him killed. The informant's death was preceded by brutal torture. *Id*. At trial, Quinones and his associates faced the death penalty, but ultimately received a sentence of life imprisonment. *Id*. Despite a *letter* written by the murder victim's mother "registering her opposition to any sentence reduction," the court ultimately reduced Mr. Quinones's sentence to a "term of 35 years' imprisonment, to be followed by lifetime supervised release.") *Id*. (Quinones's sentence was reduced in part due to his rehabilitation).

Prior to the decision in *Quinones*, the court granted *Quinones's* codefendant Diego Rodriguez' compassionate release motion. <u>See</u>: *United States v. Rodriguez*, F. Supp. 3d. 2020 WL 5810161 (S.D.N.Y. 2020) (Diego Rodriguez was Quinones' "chief lieutenant." Like *Quinones*, the court reduced Rodriguez's sentence to 30 years' followed by a lifetime of supervision.) *Id*. (Rodriguez's sentence was reduced in part due to his rehabilitation).

Similarly, the defendant in *United States v. Underwood*, 2021 U.S. Dist. LEXIS 8378 at *2 (Jan. 15, 2021, S.D.N.Y.), was the head of a violent drug distribution organization based in West

Harlem. "The group was responsible for at least five murders, and one attempted murder, committed at Underwood's direction. These murders were brutal and calculated, aimed specifically at 'eliminating and intimidating competitors, ***informants***, and actual or potential witnesses.'" *Id.* (emphasis added) (Underwood's sentence was reduced to time served in part due to his rehabilitation).

Other courts have reached similar results. See: *United States v. Perez*, No. 3:02-CR-7 (JBA) 2021 U.S. Dist. LEXIS 41040 (D. Conn. Mar. 4, 2021) (After a jury trial the defendant (*Perez*) was convicted on four counts related to the murder of Theordore Casiano. The defendant was found guilty in violation of 18 U.S.C. 1958 (Interstate Murder for hire); 18 U.S.C. 1958 & 2 (Aiding and Abetting); 18 U.S.C. 1959(a)(1) & 2 (Racketeering – Aiding and Abetting) and 18 U.S.C. 924(C)(J)(1) & 2 (Causing Death by use of a Firearm). The defendant was sentenced to life. He ultimately received time served after serving 23 years. **Importantly, the government agreed "that releasing defendant after *twenty three years* of incarceration does not present a risk to the public.")** (emphasis added) (Perez's sentence was reduced in part due to his rehabilitation). See also: *United States v. Rios*, 2020 U.S. Dist. LEXIS 230074, 2020 WL 7246440 (D. Conn. Dec. 8, 2020) (The defendant (*Rios*) was a Latin King Member. After a jury trial, defendant was convicted of violating 18 U.S.C. 1962(C) (RICO) 18 U.S.C. 1962(d) (Rico conspiracy); 18 U.S.C. 1959(a)(1) (VICAR – Murder). The defendant received three life sentences. He ultimately received a sentence reduction from three-life sentences to 360 months. The defendant had served 26 years at the time when he filed for compassionate release.) (Rios's sentence was reduced in part due to his rehabilitation); *United States v. Douglas*, 2021 WL 214563 at *1 (D.D.C. Jan. 21, 2021) (Involved a defendant who had "served almost fifty month of a 120 month sentence for second degree murder in connection with the 1990 killing of Anthony Morrisey, imposed in 2012 to run consecutive to a state sentence he was serving in New York for a different homicide offense.") (Douglas's sentence was reduced in part due to his rehabilitation); *United States v. Bass*, 2021 U.S. Dist. LEXIS 11719, No. 97-80235-1 (E.D. Mich. Jan. 22, 2021) (Involved a defendant who had *5 prior felony convictions* and was found guilty by a jury trial for conspiracy to distribute <u>50 kilos or more of crack cocaine</u>, and <u>*murder*</u> in connection to his drug trafficking. The defendant was <u>*34 years of age*</u> when the

crime was committed and <u>he was the head of the organization</u>.  **He received two concurrent life sentences, but his compassionate release motion was granted resulting in a sentence of time served after *serving 22 years*.**) (emphasis added) (Bass's sentence was reduced in part due to his rehabilitation).[3]  And finally, *United States v. Greene*, 2021 Dist. LEXIS 19243, No. 71-CR-1913 (KBJ) (D.D.C. Feb. 2, 2021) (Involved a defendant who disarmed three Marshals, to help his brother escape from a furlough. **The defendant shot and killed a fourth Marshal.**  The defendant's actions were nothing less than "horrific."  *Id*.  The defendant was <u>*23 years of age*</u> when the crime was committed, and after serving 49 years, the court granted his motion for compassionate release resulting in a sentence of time served. (emphasis added) (Greene's sentence was reduced in part due to his rehabilitation and young age).

   Notably, every single defendant in the *similar offenses* and *far more serious offense* cases cited above went to trial, and forced the government to spend a lot of money, and utilize all its resources in order to bring them to justice.  Unlike Mr. Bell, *some* of those defendants committed murders, were ring leaders involved in large violent conspiracies, weren't considered young individuals with drug habits at the time of their offenses, and most importantly, the majority of those defendants had prior criminal records.  Further, not one of those defendants demonstrated any remorse for their actions – some being *horrific*.

   Allowing Mr. Bell's sentence to remain unchanged will result in Mr. Bell serving a sentence that will far exceed the amount of time those defendants cited above were expected to serve prior to the passing of the First Step Act.  In other words, Bell's sentence may have been appropriate 12 years ago, but because the landscape has changed – specifically, defendants now being able to file 3582(C)(1)(A) sentence reduction motions, Mr. Bell's sentence is *unbalanced* when compared to defendants who were involved in *similar* if not *far more serious* conduct than Mr. Bell.  Indeed, "judges . . . have considered a change in the sentencing law landscape that a defendant would face if prosecuted today.  <u>See</u>: *United States v. Chandler*, GLR-05-0181, ECF 119 at 1-2 (D. Md. May 14, 2020); and *United States v. Johnson*, RDB-07-

---

[3]  *If his sentence is left unchanged, Mr. Bell will end up serving <u>five years more than</u> the National Average Sentence for Murder in fiscal year 2019, which was approximately 21 years' incarceration.  <u>See</u>: (Statistical Information packet Fiscal Year 2019 Seventh Cir. U.S. Sentencing Comm'n, Table 7. Apr. 2020).*

0153, ECF No. 183 at 10-11 (D. Md. Oct. 14, 2020). See also: *McCoy*, 981 F.3d at 285. As one district Judge recently explained, "[C]hanges in the sentencing law landscape are relevant to the Court's analysis of whether the Court's sentence appropriately addresses 'the need for a sentence to provide just punishment, promote respect for the law, reflect the seriousness of the offense, deter crime, and protect the public.'" *Johnson, Supra*.

Thus, when considering that there are a large number of defendants – above just being a few examples – who have extensive prior criminal records but ultimately have received sentence reductions – even to time served, the Court should be concerned that Mr. Bell who has *zero* priors and who was barely 20 years of age when he committed the instance offense, will end up serving more time than defendants who are clearly (as indicated above) known criminals who were involved in similar or far more serious conduct than Mr. Bell. Under today's climate, Mr. Bell is serving a sentence that is "greater than necessary." For this reason, Mr. Bell respectfully requests that the Court find, similar to other courts, that the sentencing disparities illustrated above, when combined with the other factors detailed herein, demonstrate "extraordinary and compelling reasons" warranting a sentence reduction. See: *United States v. Conley*, 2021 U.S. Dist. LEXIS 40763 (N.D. ILL. Mar. 4, 2021) ("Several federal courts have considered sentencing disparities, changes in law, and injustices of lengthy sentences when granting compassionate release motions.") (Citing: *Brooker*, 976 F. 3d. at 238 (2nd Cir. 2020); *McCoy*, 981 F. 3d. at 271, 286 (4th Cir. 2020); *United States v. Haynes*, 456 F. Supp. 3d. 496, 514 (E.D. N.Y. 2020); and *United States v. Cano*, 2020 U.S. Dist. LEXIS 239859 (S.D. Fla. Dec. 16, 2020).

I.      **3553(a) Factors Weigh in Favor of Granting Mr. Bell's Motion for Sentence Reduction.**

For substantially the same reasons identified above, the Court should conclude that the 18 U.S.C. 3553(a) factors weigh in favor of reducing Mr. Bell's sentence. Mr. Bell has served 166 months (adding GTC) in custody. This is a substantial sentence by any measure, especially, when considering that Mr. Bell is not a threat to the public.[4] Indeed, Mr. Bell's prison record

---

4 *Mr. Bell's "Overall Male Pattern Risk Level" reflects "Low." See: Ex A-12.*

makes clear that he is on his way to a full and unconditional rehabilitative recovery, and that the Court's sentence has had the hoped for deterrent effect. Further evidence supporting that Mr. Bell is not a danger to the public is his well-developed release plan. Upon release, Mr. Bell will reside with his "extended family in the State of Washington . . . Additionally, he plans to enroll in the Bellingham technical Institute to complete his welding apprenticeship." <u>See</u>: *Ex A-5* (*Progress Report*).

In light of the aforementioned, the Court should find that the 166 months Mr. Bell has served is a long time – long enough to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public. This is especially true in light of the relatively harsher conditions of confinement that Mr. Bell had to experience as a result of the pandemic.

If the Court were to disagree that a 166 months is not enough of a punishment, the Court should *at least* agree that a sentence reduction is warranted – one that will not be considered "greater than necessary" and will reflect the offense.


## CONCLUSION

For the reasons stated above, Mr. Bell respectfully requests that the Court grant his motion for compassionate release and impose a sentence of time served, or in the alternative, reduce his sentence to a term the Court deems appropriate.


August 6, 2021

Submitted by:
Joshua Bell (17920-280)
FCI Fairton
POBOX 420
Fairton, N.J. 08320

Joshua Bell 17080-880
Federal Correctional Institution Fairton
P.O. Box 420
Fairton, NJ
08300

RECEIVED

AUG 1 2 2021

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
                    DEPUTY



U.S. POSTAGE PAID
FCI LOB EAV
FAIRTON, NJ
08320
AUG 09, 21
$0.00
R2305E125550-03

7008 0150 0000 7068 1173

Clerk of Courts
Western District of Texas
100 East Wall Street
Midland, Texas
79701

